August E. DARKENWALD,
Plaintiff and Respondent,

v.

Hattie M. DARKENWALD,
Defendant and Appellant.

No. 7445.

Supreme Court of North Dakota.

Sept. 22, 1954.

Roy A. Ployhar, Valley City, for plaintiff and respondent.

Ilvedson, Pringle & Herigstad, Minot, for defendant and appellant.

SATHRE, Judge.

The plaintiff August E. Darkenwald brought this action against the defendant Hattie M. Darkenwald for a divorce. The complaint alleges that on or about April 28, 1950 and more than 2 years prior to the commencement of the action the defendant disregarding her marriage vows wilfully and without cause deserted and abandoned the plaintiff and ever since has and still continues wilfully and without cause to desert and abandon the plaintiff and live separate and apart from him without any sufficient cause or reason, and against his will and without his consent. Judgment is demanded for a decree of divorce from the defendant. The defendant answers by way of counterclaim or cross complaint, and after admitting certain facts alleges that she left the plaintiff because she was afraid of him on account of his behavior towards her, his threats of bodily injury to her and of his cruel and inhuman treatment towards her; the answer further alleges that plaintiff is a person with a violent temper; that he is dictatorial and that it was impossible for the defendant to reason with him, and that he would never consult her about family affairs; that he struck her and twisted her arm and committed other similar assaults upon her at various times; that in March 1949 he struck her on her nose causing it to be black and blue; and that he has threatened to strike her at various other times.

The defendant then demands judgment that plaintiff's action for divorce be dismissed and that she be granted a decree of separation from bed and board forever from the plaintiff and that the court grant her support and maintenance in the sum $125 per month, and that a $6,000 paid up life insurance policy be left with her as the beneficiary.

The case was tried at Valley City, North Dakota before the Honorable John Sad, Judge of the District Court, Barnes County. The trial court found that the defendant had deserted the plaintiff and that the plaintiff was entitled to a divorce. The trial court found further that the plaintiff should pay to the defendant the sum of $1,160 as alimony and the sum of $200 as attorneys' fees a total of $1,360, less the sum of $50 paid by the plaintiff to defendant's attorneys at the time of the trial of the action; that the plaintiff should pay said sum in annual payments of $400 the first payment to be made January 2, 1954, the second payment of $400 January 2, 1955, the third payment of $400 January 2, 1956 and the balance of $110 on January 2, 1957, without interest. That to secure payment of said sums plaintiff should retain the defendant as beneficiary of his life insurance in the sum of at least $3,000 until said payments were made in full, and might thereafter change the beneficiary if he so desires.

The trial court further found that each of the parties should be entitled to retain as their own property any and all other property now in their name and possession including all of their personal effects, clothing and other belongings and that this should constitute a final and conclusive property settlement between the parties hereto.

The defendant appealed from the judgment and demanded a trial de novo in this court.

Defendant contends first that the trial court erred in granting the plaintiff a divorce and that it is clearly established by the evidence that the defendant left the plaintiff because of his cruelty and conduct towards her, and that therefore the fact

that she left him was not desertion under section 14-0506 NDRC 1943.

There is very little dispute in the evidence and the facts as established by the record are substantially as follows:

The plaintiff and defendant were married at Moorhead, Minnesota on August 9, 1924 and lived together as husband and wife until April 29, 1950 when defendant left plaintiff and thereafter lived separate and apart from him. One son was born to this union who is now of age and married. It is undisputed that ever since their marriage both plaintiff and defendant have been engaged in teaching in various towns in the State of North Dakota, most of the time teaching in the same schools. That at the time of the alleged desertion of the defendant the parties were residing at Galesburg, North Dakota where the plaintiff was engaged as principal of schools. On the evening of April 28, 1950 plaintiff and defendant attended a high school play at Galesburg, N. Dak. Plaintiff testified that on the morning of April 29th, the defendant without any previous notice or warning took her suitcases from a closet and requested the plaintiff to take her to Fargo stating that she was going to California. Plaintiff took her to Fargo and said that he was dumfounded because he could not understand why she was leaving and going to California. There was very little conversation between the parties on their way to Fargo. Plaintiff left the defendant at the Graver Hotel and thereafter returned to Galesburg where he continued to teach and finished his term of school. The defendant left for California and plaintiff did not see her until August 1950 when he happened to see her in the City of Fargo. The parties had lived in a rented house at Galesburg and the plaintiff kept the house and continued to teach in Galesburg the following year. The defendant after returning from California accepted a teaching contract at Crosby, North Dakota in the fall of 1950. The plaintiff contends that he asked her to return to him at Galesburg and live with him, but that she refused so to do. Plaintiff and defendant saw each other occasionally in Fargo during Christmas vacation and plaintiff said he asked her to return and live with him but she always refused; that they have not lived together as husband and wife since April 29, 1950.

With reference to their financial affairs the parties for some time had a joint banking account. The main difficulties between the parties seem to have arisen over the fact that for some time during their married life the plaintiff made monthly payments for support of his ailing parents in the sum of $5 to $10 a month until their death, amounting in all to about $700. Defendant claims that the plaintiff refused to make contributions for the support of her widowed mother. Plaintiff claims that her widowed mother was in no need of support, that she had a considerable amount of money and that at no time was she in need of assistance. Some years prior to the commencement of this action the parties decided to have separate accounts, and they made a division of their money and bonds, which they owned jointly. From the evidence it would appear that in the division of the bonds which they owned jointly, approximately $700 or $750 maturity value, were turned over to the defendant and that a like amount was turned over to the plaintiff. During the two or three years prior to the commencement of this action the plaintiff was receiving as salary for teaching from $3,200 to $3,500 and the defendant was receiving from $2,800 to $2,900 per school year. As stated they then had separate bank accounts. The defendant claims that the plaintiff never bought any clothes for her and that she had to buy her own clothes and that she also used some of her own money with which to pay for the groceries and other things that were needed in their household.

When they first began to teach, neither party had a college degree. Defendant claims that she helped the plaintiff with money thus enabling him to go to college so as to obtain his B. A. degree; that he promised to repay her and that he would also assist her so that she could take time off and secure her degree, but that he never did and that he still owes her for money that she advanced him when he was studying to secure his degree.

There also seems to have been some disagreement between them in reference to the purchase of automobiles. At first they had a second hand Ford car; he then traded it for a second hand Chevrolet. Thereafter he sold the Chevrolet and bought an Oldsmobile, against her wish, but she said that she finally consented to it.

With references to their finances both parties have helped their only child, a son, with modest sums of money from time to time which seems to have met with the approval of both.

Neither party has much property or money. Defendant testified that she has about $300 on checking account and that she has $800 which she saved from her earnings and which is held jointly by her and her son to be used to defray her funeral expenses. The parties shipped their furniture to their son at Virginia, Minnesota and it was there at the time of the trial, except an electric stove and a refrigerator which the plaintiff sold at Fargo. The plaintiff has no property except a 1949 Oldsmobile car. They had a house trailer which he sold for $495 to which he added enough to make $600 which sum he gave to the defendant. Before he bought the Oldsmobile he sold the Chevrolet car for $600 and kept the money, and that was the reason he gave the defendant the proceeds of the sale of the house trailer. He stated that in addition to the money from the house trailer sale which defendant received she also received $400 from him in different amounts at different times after April 1950.

Mrs. Raymond Olstad, a witness for plaintiff testified that she lived in Galesburg while the plaintiff and defendant were living there; that she was the clerk of the school board while the plaintiff was teaching in Galesburg, and that she became acquainted with both plaintiff and defendant and that the defendant left Galesburg in April 1950; that the last time she saw the defendant was the evening of April 28, 1950 at a high school play, and that the defendant left the day after the high school play and never came back to Galesburg

thereafter; that the plaintiff finished teaching the school term and continued to teach there the following year; that he lived alone and that the defendant never returned; the witness never saw any evidence of any trouble between plaintiff and defendant. Her husband, Raymond Olstad, testified that he was well acquainted with the plaintiff and defendant, and that he and his wife were close neighbors to them; that they visited back and forth and that he never noticed or knew of any trouble between plaintiff and defendant; that he and his wife were at the high school play at Galesburg on April 28, 1950, and that plaintiff and defendant were there. He never saw the defendant in Galesburg after the high school play; that plaintiff finished the balance of the school term and continued to teach there the following year; that defendant never returned to Galesburg and that plaintiff lived there alone during all that time.

The defendant admits that she left the plaintiff on April 29, 1950, as alleged in the complaint. She claims however that she is afraid to return to him because of his conduct toward her. She claims that on many occasions he called her vile and dirty names; that he has made excessive demands on her for the marital relation; that he twisted her arms and her legs and that he once struck her on the nose and committed other acts of violence against her.

The plaintiff admitted that he "might have been a little rough a couple of times", but there is no evidence however that she at any time made any complaint to any one of such conduct on the part of the plaintiff, and she could not remember any specific instance of such conduct. She admitted that plaintiff had asked her to come back, but that she refused because she was afraid of him.

No witnesses other than the defendant testified as to any acts of cruelty by the plaintiff. An affidavit executed by one Julia R. Jones of Glenfield was stipulated into the record by the counsel for the parties. This affiant states that from Septem-

ber 1, 1945 to the end of the school year 1946 she heard Mr. Darkenwald often use vile and profane and abusive language toward the defendant after which he often left the house slamming the door; that he would take his car and leave Mrs. Darkenwald week ends and once was gone nearly the whole Christmas vacation. The incidents referred to in this affidavit seem to have occurred during the school year from September 1945 to the end of the school year 1946. This would be more than 3 years prior to the time that the defendant left the plaintiff.

■ Where an appeal is taken from a judgment in a divorce case and a trial de novo is demanded it becomes necessary to review all of the evidence including the conduct of the parties which it is claimed constitute grounds for divorce. Mattson v. Mattson, N.D., 56 N.W.2d 764; Hoellinger v. Hoellinger, 38 N.D. 636, 166 N.W. 519; Henry v. Henry, 77 N.D. 845, 46 N.W.2d 701. It is conceded by the defendant that she left the plaintiff on April 29, 1950 and that since that time they have not lived together as husband and wife, and she still refuses to live with him as his wife. Defendant contends that under subdivision 3, Section 14–0506 NDRC 1943, the plaintiff was guilty of cruelty so as to justify the defendant to leave him and refuse to return. Said subdivision 3 reads as follows:

"Departure or absence of one party from the family dwelling place caused by the cruelty or by threats of bodily harm from which danger reasonably would be apprehended from the other is not desertion by the absent party".

With reference to defendant's complaint that the plaintiff had twisted her arms and legs, he admitted that he "might have been a little rough a couple of times". From the testimony of the defendant it appears that these episodes occurred at times when she refused to have sexual relations with him. There is no evidence in the record however that such relations would be injurious to defendant's health. Six years before she left the plaintiff she had consulted Dr. Frank Darrow of Fargo about her nervous condition and he told her that he did not know whether to send her to a sanitarium or to the west coast. He gave her some medicine for her nerves that gave her relief and she taught school for three years thereafter.

As to her reason for consulting Dr. Darrow she was asked this question:

"Q. Did he give you any nerve sedative? A. Well, yes because that was the time we had this trouble about my mother. He gave me one nerve medicine and then another. My mother had died. He finally gave me one that did help me some and I did go teaching and I made up my mind that I was going to try not to lose my mind."

She was further asked whether she left Galesburg in 1950 upon the advice of Dr. Darrow to which she replied:

"Dr. Darrow had nothing to do with it, I just couldn't take it any longer."

It appears from defendant's testimony that she had developed a resentment and dislike for the plaintiff for several years because of plaintiff's objection to making contributions to defendant's mother, and this resentment had become an obsession to such an extent that she refused to have marital relations with him.

The plaintiff testified that he loved his wife and that he loved her as much as when he married her and that he asked her many times to come back and live with him. The last time that he asked her to come back and live with him was in Fargo when they were "trying to settle things up." And he then told her "lets drop the whole thing". She said she would come back and live with him if she wouldn't have to live with him as man and wife. She said she would live in the same house with him but not as man and wife. To which he replied that was not the way to live together.

If as the testimony shows the defendant was willing to associate with the plaintiff, live in the same house with him, it cannot be said she was in fear of any mistreatment by him.

After the defendant had left the plaintiff he changed the beneficiary of a paid up insurance policy which he carried and made his son the beneficiary in place of his wife. In referring to this matter he made the following statement:

"I think that she wanted the insurance policy but I think right in her own mind she would like to come back and still doesn't want to come back. I think that we are at the age where we should be living together but it just doesn't come to that."

He also stated that he would make the defendant the beneficiary if she would come back and live with him.

■■ After considering all of the evidence we do not believe it is sufficient to establish that defendant suffered such cruel treatment at the hands of the plaintiff that under subdivision 3 section 14–0506 her refusal to live with him was justified. On the other hand if the defendant without sufficient legal grounds left the plaintiff and for a year or more refused to resume marital cohabitation with him, her conduct constituted desertion under subdivision 1 of said section 14–0506 which provides:

"Willful desertion is the voluntary separation of one of the married parties from the other with intent to desert:

"1. Persistent refusal to have reasonable matrimonial intercourse as husband and wife when health or physical condition does not make such refusal reasonably necessary, or the refusal of either party to dwell in the same house with the other party when there is no just cause for such refusal, is desertion".

■ The trial court saw the parties, heard their testimony, observed their conduct and general demeanor. He found from all of the evidence that the defendant had deserted the plaintiff and that plaintiff was entitled to a decree of divorce. Where, as in this case, upon a trial anew in this court, the findings of the trial court determine questions of fact, such findings are entitled to appreciable weight. After a careful consideration of the entire record we are of the opinion that the findings of the trial court should not be disturbed, and that the plaintiff is entitled to a decree of divorce. It follows therefore that defendant having deserted the plaintiff she is not entitled to a decree of separation from bed and board.

■■ Defendant next contends that the property settlement made and the alimony allowed by the trial court were unjust and inequitable. As the evidence shows, neither party has much money or property, in fact, the defendant appears to have fully as much as the plaintiff. At the time of the trial plaintiff was of the age of 54 years and the defendant was of the age of 51 years. Both are teachers in the public schools of the state. During the last school year before the trial of the action plaintiff's salary was $3,500 and defendant's salary was $2,900. Plaintiff has no financial resources other than the salary he receives as a teacher. He is not in the best of health. His sense of hearing is somewhat impaired and he is suffering from a stomach ailment. The judgment of the district court requires him to pay the defendant $1,160 and $200 attorneys' fees. Considering the earning capacity of the plaintiff and his general health we are of the opinion that the allowance made by the district court was fair and equitable. The defendant stated that her health had been good the last year and was good at the time of the trial. As a teacher she is capable of earning $2,900 to $3,000 per year. Under all of the circumstances and the evidence we conclude that the judgment of the trial court was correct and it is affirmed.

MORRIS, C. J., and BURKE, GRIMSON and JOHNSON, JJ., concur.